UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE B., | Case No. CV 18-6470-SP |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| ANDREW M. SAUL, Commissioner of Social Security Administration, | |
| Defendant. | |

**I.**

**<u>INTRODUCTION</u>**

On July 26, 2018, plaintiff Jose B. filed a complaint against the Commissioner of the Social Security Administration ("Commissioner"), seeking a review of a denial of a period of disability and disability insurance benefits ("DIB"). The parties have fully briefed the matters in dispute, and the court deems the matter suitable for adjudication without oral argument.

Plaintiff presents five issues for decision: (1) whether the Administrative Law Judge ("ALJ") properly considered the opinions of plaintiff's treating physicians; (2) whether the ALJ properly discounted plaintiff's subjective

1

complaints; (3) whether the ALJ properly considered lay witness testimony; (4) whether the ALJ's residual functional capacity (RFC) determination was supported by substantial evidence; and (5) whether the ALJ properly considered the vocational expert (VE) testimony.  Plaintiff's Memorandum in Support of Plaintiff's Complaint ("P. Mem.") at 16-29; *see* Memorandum in Support of Defendant's Answer ("D. Mem.") at 1-15.

Having carefully studied the parties' memoranda, the Administrative Record (AR), and the decision of the ALJ, the court concludes that, as detailed herein, although the ALJ properly discounted plaintiff's and the lay witness testimony, the ALJ erred by failing to properly consider the opinions of plaintiff's treating physicians, and therefore must reassess plaintiff's RFC.  The court therefore remands this matter to the Commissioner in accordance with the principles and instructions set forth in this Memorandum Opinion and Order .

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was 54 years old on the alleged disability onset date.  AR at 101. He has an eighth grade education and past relevant work as a car porter, assembly press operator, and small parts assembler.  *Id.* at 94, 270.

On December 30, 2013, plaintiff filed an application for a period of disability and DIB alleging disability beginning November 10, 2012 due to back injury, diabetes, depression, neck injury, and knee injury.  *Id.* at 101.  The Commissioner denied plaintiff's applications initially, and upon reconsideration, after which he filed a request for a hearing.  *Id.* at 112-26.

On February 22, 2017, plaintiff, represented by counsel, appeared and testified at a hearing before the ALJ with the assistance of a Spanish language interpreter.  *Id.* at 48-50, 54-93.  The ALJ also heard testimony from Sharon Spaventa, a vocational expert.  *Id.* at 93-98.  On May 19, 2017, the ALJ denied

plaintiff's claim for benefits.  *Id.* at 21-42.  Applying the well-known five-step sequential evaluation process, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since November 10, 2012, the alleged onset date.  *Id.* at 23.

At step two, the ALJ found plaintiff suffered from the following severe impairments: degenerative disc disease; degenerative joint disease; and diabetes mellitus.  *Id.* at 23.

At step three, the ALJ found plaintiff's impairments, whether individually or in combination, did not meet or medically equal one of the listed impairments set forth in 20 C.F.R. part 404, Subpart P, Appendix 1.  *Id.* at 30.

The ALJ then assessed plaintiff's RFC,[1] and determined plaintiff had the RFC to perform light work, with the limitations that he could: frequently balance, stoop, crouch, and crawl; occasionally kneel; occasionally climb stairs, ramps, ladders, and scaffolds; and never climb ropes.  *Id.* at 31-32.  The ALJ also found plaintiff is limited to simple, routine tasks consistent with his work history and experience.  *Id.* at 32.

The ALJ found, at step four, that plaintiff could perform his past relevant work as a small parts assembler and assembly press operator.  *Id.* at 41.  Consequently, the ALJ concluded plaintiff did not suffer from a disability as defined by the Social Security Act.  *Id.* at 42.

Plaintiff filed a timely request for review of the ALJ's decision, which was denied by the Appeals Council.  *Id.* at 1-8.  The ALJ's decision stands as the final decision of the Commissioner.

---

[1]    Residual functional capacity is what a claimant can do despite existing exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155-56 n.5-7 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

**III.**

**STANDARD OF REVIEW**

This court is empowered to review decisions by the Commissioner to deny benefits.  42 U.S.C. § 405(g).  The findings and decision of the Social Security Administration must be upheld if they are free of legal error and supported by substantial evidence.  *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001) (as amended).  But if the court determines the ALJ's findings are based on legal error or are not supported by substantial evidence in the record, the court may reject the findings and set aside the decision to deny benefits.  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001).

"Substantial evidence is more than a mere scintilla, but less than a preponderance."  *Aukland*, 257 F.3d at 1035.  Substantial evidence is such "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276 F.3d at 459.  To determine whether substantial evidence supports the ALJ's finding, the reviewing court must review the administrative record as a whole, "weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion."  *Mayes*, 276 F.3d at 459.  The ALJ's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"  *Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the reviewing court "'may not substitute its judgment for that of the ALJ.'"  *Id.* (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).

1

2

**IV.**

**DISCUSSION**

3

4

**A.   The ALJ Improperly Rejected the Opinions of Plaintiff's Treating Physicians**

5

6

7

8

Plaintiff argues the ALJ erred by failing to properly weigh the opinions of his treating physicians, Dr. Farsar and Dr. Rashti.  P. Mem. at 17-22.  Specifically, plaintiff argues the reasons provided by the ALJ for discounting their opinions are inconsistent with the medical record, and are not legally sufficient.  *Id.* at 19.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

In determining whether a claimant has a medically determinable impairment, among the evidence the ALJ considers is medical evidence.  20 C.F.R. §§ 404.1527(b), 416.927(b).[2]  In evaluating medical opinions, the regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians.  20 C.F.R. §§ 404.1527(c), (e), 416.926(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (as amended). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's."  *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(1)-(2), 416. 927(c)(1)-(2).  The opinion of the treating physician is generally given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant.  *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

23

24

25

Nevertheless, the ALJ is not bound by the opinion of the treating physician. *Smolen*, 80 F.3d at 1285.  If a treating physician's opinion is uncontradicted, the ALJ must provide clear and convincing reasons for giving it less weight.  *Lester*,

26

27

28

---

[2]   The Social Security Administration issued new regulations effective March 27, 2017.  All regulations cited in this decision are effective for cases filed prior to March 27, 2017.

81 F.3d at 830.  If the treating physician's opinion is contradicted by other opinions, the ALJ must provide specific and legitimate reasons supported by substantial evidence for rejecting it.  *Id.*  Likewise, the ALJ must provide specific and legitimate reasons supported by substantial evidence in rejecting the contradicted opinions of examining physicians.  *Id.* at 830-31.  The opinion of a non-examining physician, standing alone, cannot constitute substantial evidence. *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993).

### 1.   Pertinent Medical Opinions and Records

#### a.   Treating Physicians

*Dr. Nader Farsar*

Dr. Farsar, a chiropractor and plaintiff's primary treating physician, treated plaintiff from November 2012 through August 2016 as part of his worker's compensation claim.  *See* AR at 350-59, 1130-76.  On November 21, 2012, Dr. Farsar examined plaintiff and found pain, muscle spasm, and tenderness bilaterally in the upper and lower cervical and lumbar areas, and moderate pain in the knee area.  *Id.* at 356.  Dr. Farsar also conducted orthopedic tests and found positive cervical compression, positive straight leg raising with radiculopathy, and pain at the medial aspect of the right knee joint.  *Id.*  Based on the subjective and objective findings of the physical examination, Dr. Farsar diagnosed plaintiff with cephalgia, posttraumatic cervical sprain/strain with myofascitis, cervical radiculopathy, cervical muscle spasm, posttraumatic lumbar sprain/strain with myofascitis, lumbar radiculopathy, lumbar muscle spasm, diabetes, insomnia, sexual dysfunction, and stress-related condition.  *Id.* at 357.  Dr. Farsar then recommended a course of physiotherapy and chiropractic care three times per week for four weeks, and plaintiff was placed on temporary total disability (TTD) until December 21, 2012.

1    *Id.*

2      On January 21, 2013, Dr. Farsar obtained a magnetic reasoning image

3 (MRI) of plaintiff's lumbar and cervical spine. *Id.* at 361-62. The MRI results of

4 plaintiff's cervical spine revealed the following: a 4-5 mm disc protrusion at C4-C5

5 with moderate left greater than right central stenosis and moderately severe neural

6 foraminal stenosis; a 5 mm disc bulge with severe left greater than right central

7 stenosis and severe neural foraminal stenosis at C5-C6; and a 3-4 mm disc bulge

8 and moderately severe left and right neural foraminal stenosis, and moderately

9 severe central stenosis at C6-C7. *Id.* at 361, 1165-66.

10      The MRI results of plaintiff's lumbar spine revealed a 4 mm disc protrusion

11 with an annular tear and moderately severe central canal stenosis and moderate

12 neural foraminal stenosis at L5-S1; a 3-4 mm right greater than left bulge with

13 moderate right greater than left neural foraminal stenosis and moderate central

14 canal stenosis at L4-L5; a 4 mm broad leftward protrusion with moderate left

15 neural foraminal stenosis and moderate central stenosis at L3-L4; and a 3-4 mm

16 right greater than left lateralizing bulge or protrusion with mild to moderate right

17 greater than left neural foraminal stenosis with an annular tear at L2-L3. *Id.* at 363,

18 1166. On March 12, 2013, plaintiff underwent an MRI of his right knee, and Dr.

19 Farsar found a small anterior horn of the lateral meniscus with possible tear and

20 subluxations of the portion of the menisci, and moderate joint effusion. Dr. Farsar

21 also suspected plaintiff had a high-grade ACL sprain. *Id*. at 1166.

22      Although Dr. Farsar remained plaintiff's primary treating physician, he

23 referred plaintiff to several other physicians for treatment. *See id.* at 1159-65. On

24 February 25, 2014, Dr. Farsar issued a Permanent and Stationary Report indicating

25 plaintiff had reached maximum medical improvement. *Id.* at 1170. After

26 reviewing his and other physicians' clinical findings, as well as MRI reports of

27 plaintiff's lumbar spine, cervical spine, and right knee, Dr. Farsar opined that

28

plaintiff was unable to perform his previous usual and customary job duties, and restricted him from prolonged sitting in fixed position, prolonged walking or standing, repetitive bending, heavy lifting, and repetitive squatting and kneeling. *Id.* at 1168.

*Dr. Jalil Rashti*

Dr. Farsar referred plaintiff to Dr. Rashti, an orthopedic surgeon, due to his complaints of persistent neck pain. *See id.* at 388, 1169. On February 20, 2013, Dr. Rashti examined plaintiff and found a slight limp favoring the right side, loss of range of motion of his lumbar and cervical regions, tenderness at the cervical and lumbosacral regions and right knee, a positive patellar compression test, positive McCurray's sign, atrophy and weakness at the right quadriceps, and diminished sensation of the right knee. *Id.* at 390-92. After evaluating plaintiff and reviewing Dr. Farsar's diagnoses and the MRI results of plaintiff's lumbar and cervical spine, Dr. Rashti diagnosed plaintiff with multilevel cervical discogenic disease with radiculitis, multilevel lumbar discogenic disease with radiculitis, and right internal derangement. *Id.* at 393-94.

On March 27, 2013, Dr. Rashti performed electrodiagnostic testing of plaintiff's cervical and lumbar spine. *Id.* at 383-86. The cervical electrodiagnostic testing revealed severe impairments on the left occipital nerve and right thoracic nerve; mild impairment on the posterior division of the cervical nerve and first thoracic nerve; marked impairment of the left cervical nerve; and very severe impairments on the right suprascrapular nerve, left radial nerve medical branch, right unlar nerve, and left thoracic nerve. *Id.* at 383. Electrodiagnostic testing of the lumbar spine revealed very severe impairments of the bilateral upper lumbar nerve, left femoral cutaneous nerve, bilateral femoral cutaneous nerve, right saphenous nerve, and bilateral peroneal nerve; severe impairments of the bilateral sural nerve and right femoral cutaneous nerve; marked impairments of the right

1  femoral cutaneous nerve; and moderate impairment of the left saphenous nerve.

2  *Id.* 386.

3       On May 15, 2013, Dr. Rashti examined plaintiff and issued a final

4  orthopedic evaluation with impairment ratings.  *Id.* at 371.  Dr. Rashti examined

5  plaintiff and reiterated the clinical findings of his initial examination.  *Id.* at 373-

6  79.  Again for worker's compensation purposes, Dr. Rashti opined that plaintiff

7  should avoid: staying in one position such as prolonged sitting, standing, and

8  walking; repeat bending and stooping; and lifting, pushing, and pulling heavy

9  objects.  *Id.* at 377.  With respect to plaintiff's right knee, Dr. Rashti opined that

10  plaintiff should avoid repetitive kneeling, squatting, stair climbing, walking on

11  uneven ground, and prolonged walking and standing.  *Id.*  In making his

12  determination, Dr. Rashti specified he relied on subjective and objective factors of

13  disability including the MRI findings and his clinical findings which revealed a

14  loss of range of motion of the cervical and lumbosacral regions, limp favoring the

15  right side, weakness of the right quadriceps, and tenderness at the cervical and

16  lumbosacral regions and right knee.  *Id.*

17       *Dr. Marvin Pietruszka*

18       On December 17, 2013, Dr. Farsar referred plaintiff to Dr. Pietruszka, an

19  occupational medicine specialist, for reevaluation relating to his various

20  conditions, including diabetes, irritable bowel syndrome, gastritis, and

21  hypertension.  *Id.* at 497.  Dr. Pietruszka conducted a physical examination of

22  plaintiff and found myopasm, tenderness, and a moderate reduction in range of

23  motion in the posterior cervical and lumbar paraspinal musculature, as well as a

24  significant decrease in flexion.  *Id.*  A radiograph of the lumbar spine revealed

25  osteoarthritic changes throughout the cervical vertebrae, and the lumbar spine

26  revealed degenerative arthritic changes.  *Id.* at 498.  Based on his subjective and

27  objective findings, Dr. Peitruszka diagnosed plaintiff with musculoligamentous

28

1   sprain/strain cervical spine, cervical disc protrusion, strain lumbar spine, lumbar

2   disc protrusion, diabetes mellitus accelerated by work injury, sleep disorder,

3   depressive disorder, erectile dysfunction, osteoarthritis in the cervical and lumbar

4   spine, early osteoarthritis in the right knee, irritable bowel syndrome, gastritis,

5   hyperlipidemia, hypertension, and bleeding internal hemorrhoids. *Id.* at 499. Dr.

6   Peitruszka also determined that plaintiff was to continue on TTD for a month. *Id.*

7   On January 14, 2014, Dr. Pietruszka issued a Permanent and Stationary Report

8   reiterating the objective findings and diagnoses of his physical examination. *See*

9   *id.* at 565-66. Dr. Pietruszka also determined that plaintiff was permanent and

10  stationary, and should be precluded from heavy lifting and avoid undue

11  psychological stress. *Id.* at 569.

12       *Dr. Jonathan Kohan*

13       Dr. Kohan, a pain management physician, treated plaintiff from April 2013

14  through July 2016 due to his complaints of neck and low back pain. *See id.* at 502-

15  49, 1077-1129. On April 2, 2013, Dr. Kohan examined plaintiff and found

16  moderate spasm and decreased range of motion of the cervical and lumbar spine,

17  and positive straight leg raising on the right. *Id.* at 509-11. Based on a review of

18  the January 21, 2013 MRIs of plaintiff's cervical and lumbar spine, Dr. Kohan

19  indicated that he found lumbar disc herniation, lumbar radiculopathy, multiple

20  level cervical disc protrusion, cervical radiculopathy, and right knee tendinosis. *Id.*

21  at 512. Dr. Kohan indicated that plaintiff had elected not to proceed with cervical

22  surgery. *Id*. at 535.

23       During follow-up physical examination in 2016, Dr. Kohan noted spasm and

24  tenderness in plaintiff's cervical spine and lumbar spine with decreased range of

25  motion on flexion and extension. *See id.* at 1084, 1087, 1094, 1096, 1099, 1103,

26  1113. Dr. Kohan prescribed plaintiff with Elavil, an antidepressant, and Tylenol

27  with codeine number 4 as pain medication, and recommended that plaintiff stop

28

1    using Tramadol to prevent a synergistic effect.  *Id.* at 1084.  Dr. Kohan

2    administered three cervical epidural injections, and a lumbar epidural injection.

3    *See id.* at 534, 542, 1077-78, 1096-97, 1128-29.  Plaintiff demonstrated significant

4    improvement with the cervical epidural injections.  *Id.* at 1080.

5            *Dr. Richard Hubbard*

6            On August 21, 2013, Dr. Hubbard evaluated plaintiff for a sleep disorder,

7    and found plaintiff had insomnia, night-time awakening, difficulty going to sleep,

8    pain during the night, and daytime fatigue and tiredness.  *Id.* at 602.  Dr. Hubbard

9    also performed a general evaluation and noted plaintiff had visual loss, muscle

10   weakness in the right leg, difficulty walking, right leg weakness, joint pain in the

11   right knee, emotional distress, depression, agitation, and irritability.  *Id.* at 602-03.

12   Dr. Hubbard also indicated plaintiff had cervical and lumbar tenderness, and

13   plaintiff was wearing a right knee brace.  *Id.* at 603.

14           *Other Medical  Treatment*

15           On October 15, 2013, Dr. Steven Silbert evaluated plaintiff in the capacity of

16   an Agreed Medical Examiner to address plaintiff's complaints of neck and back

17   pain.  *See id.* at 772-826.  Dr. Silbert examined plaintiff and found tenderness and

18   decreased range of motion in his cervical spine and decreased range of motion,

19   tenderness, and positive straight leg raising in his lumbar spine.  *Id.* at 795.  On

20   February 7, 2014, Dr. Silbert issued a final report and opined that plaintiff was not

21   capable of performing his usual and customary job duties and that he should avoid

22   heavy lifting, repetitive bending, and stooping.  *Id.* at 824-826.

23           On March 24, 2014, Dr. Bernard Monderer, an ophthalmologist, performed

24   an Agreed Medical Evaluation related to plaintiff's vision.  *Id.* at 718-26.  Plaintiff

25   complained of visual blurring with the use of his glasses.  *Id.* at 719.  Visual field

26   testing noted diffuse and severely depressed fields of vision, but the result was

27   questionable since there were multiple fixation losses in the test for both eyes.  *Id.*

28

Dr. Monderer indicated that there were no work restrictions from an ophthalmic standpoint and a change of eye glasses would completely resolve patient's complaints. *Id.* at 722. On January 29, 2016, Dr. Leonard Liang, a urologist, performed a Panel Qualified Medical Evaluation in the specialty of urology. *Id.* at 827-961. Dr. Liang noted poor diabetic control, and determined plaintiff's complaints were credible but unrelated to the work accident. *Id.* at 960.

### b. **Examining Physician Dr. Helen Rostamloo**

On February 5, 2015, Dr. Rostamloo, a consulting physician, completed an internal medicine evaluation of plaintiff. *Id.* at 589-93. Plaintiff complained of pain in his low back, neck, and right knee. *Id.* at 589. Plaintiff also complained of blurred vision, but Dr. Rostamloo indicated plaintiff had no glasses. *Id.* Plaintiff had previously used Tramadol until January 2015, and thereafter he reported taking over-the-counter medication for his pain. *Id.* Dr. Rostamloo indicated she reviewed medical records that included at least his MRI results from January 2013. *Id.* at 592. Dr. Rostamloo completed a physical examination, and found plaintiff had normal gait and balance. *Id.* at 590. On exam, the cervical spine was tender to percussion, and there was pain with full range of motion. *Id.* The lumbar spine was also tender. *Id.* at 591. There was positive straight leg raising bilaterally, and limited range of motion. *Id.* There was right knee pain and crepitus with full range of motion. *Id.*

Based on these findings, Dr. Rostamloo provided a functional assessment, opining that plaintiff could: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk no more than six hours out of an eight-hour day; climb, balance, kneel, and crawl frequently; and walk on uneven terrain, climb ladders, and work at heights occasionally. *Id.* at 593. Dr. Rostamloo opined that there were no limitations for pushing and pulling, sitting, hearing, fingering, handling, feeling, and reaching, but plaintiff had a bilateral visual limitation. *Id.*

### c.   State Agency Physician P.N. Ligot

State agency physician Ligot reviewed various medical records available prior to the date of his report in March 2014. *Id.* at 102-04. Dr. Ligot opined plaintiff could: lift and carry 20 pounds occasionally and 10 points frequently; stand, walk, and sit for about six hours in an eight-hour workday; perform unlimited pushing and pulling other than as shown for lifting and carrying; occasionally climb, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds; and had no manipulative, visual, communicative, or environmental limitations. *Id.* at 109-10.

### 2.   The ALJ's Findings

The ALJ determined plaintiff had the RFC to perform light work with the limitations that he could: frequently balance, stoop, crouch, and crawl; occasionally kneel; and occasionally climb stairs, ramps, ladders, and scaffolds. *Id.* at 31-32. The ALJ precluded plaintiff from climbing ropes, and limited him to simple, routine tasks consistent with his work history and experience. *Id.* at 32. In reaching his RFC determination, with respect to the opinions at issue, the ALJ gave the greatest weight to the opinion of Dr. Rostamloo, finding her opinion was based on detailed clinical evaluations and consistent with the medical record. *Id.* at 40-41. The ALJ gave only some weight to the state agency physicians because additional medical evidence was received into the record after their assessments. *Id.* at 39.

The ALJ gave minimal weight to the opinions of plaintiff's treating physicians, which were provided as part of his workers' compensation case, based on the following reasons: (1) a disability finding in the workers' compensation context is not binding on a disability determination under the Social Security Act, and it relies on different criteria than that used in determining disability in the social security context, making the conclusions and observations of limited

13

probative value; (2) there was insufficient objective support for their opinions, and their diagnoses appeared to rely on plaintiff's self-reported complaints rather than objective evidence; and (3) there was no functional assessment regarding plaintiff's residual capacity.  *Id.*

### 3.   The ALJ Failed to Properly Consider the Opinions of the Treating Physicians

To reject a treating physician's opinion that is contradicted by other opinions, the ALJ must provide specific and legitimate reasons supported by substantial evidence for rejecting it.  *Lester*, 81 F.3d at 830.  Here, Drs. Rashti and Farsar restricted plaintiff from prolonged sitting, standing, and walking, as well as repetitive bending, stooping, squatting and kneeling.  *See* AR at 377, 1168.  By contrast, Dr. Rostamloo opined that plaintiff could stand and walk for six hours out of an eight-hour day; climb, balance, kneel, and crawl frequently; and had no sitting limitations.  *See id.* at 593.  Thus, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for rejecting the opinions of plaintiff's treating physicians.[3]

The ALJ's first reason for rejecting the opinions of plaintiff's treating

---

[3]   In stating his reasons for giving minimal weight to the treating physicians, the ALJ did not distinguish among them or their opinions, and perhaps for that reason failed to note that plaintiff's primary treating physician, Dr. Farsar, is a chiropractor and therefore an "other source" rather than an "acceptable medical source."  *See* 20 C.F.R. § 404.1513(d)(1) (chiropractors are not acceptable medical sources).  As an other source, Dr. Farsar's opinions could be accorded less weight than opinions from acceptable medical sources.  *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996), *superseded by regulation on other grounds*.  Nevertheless, the ALJ was still required to consider Dr. Farsar's opinion and only reject it if there was a germane reason.  *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).  Moreover, Dr. Rashti, an orthopedic surgeon, is an acceptable medical source and opined substantially the same restrictions.  Accordingly, the court simply considers whether the ALJ provided specific and legitimate reasons supported by substantial evidence for rejecting the treating physicians' opinions.

physicians Drs. Rashti and Farsar was that a determination of disability provided for a workers' compensation claim is not binding with regard to a disability determination under the Social Security Act, and conclusions and observations made using worker's compensation criteria are of limited probative value.  AR at 39.  An ALJ is not bound to accept or apply a workers' compensation physician's status designation, such as temporary total disability, because such terms of art are "not equivalent to Social Security disability terminology."  *Dawson v. Colvin*, 2014 WL 5420178, at *5 (C.D. Cal. Oct. 23, 2014) (citing *Desrosiers v. Sec'y of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988)); *Macri v. Chater*, 93 F.3d 530, 544 (9th Cir. 1996); *Booth*, 181 F. Supp. 2d at 1104; *see also* 20 C.F.R. § 404.1504.  Thus, insofar as the ALJ disregarded Drs. Rashti's and Farsar's ultimate disability determinations, he did not err.

Nonetheless, an "ALJ may not disregard a physician's medical opinion simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in the terminology used in such proceedings." *Booth v. Barnhart*, 181 F. Supp. 2d 1099, 1105 (C.D. Cal. 2002) (citation omitted). Yet the ALJ indicated he did just that in finding Drs. Rashti's and Farsar's conclusions and observations of "limited probative value" because they relied on worker's compensation criteria.  *See Dawson,* 2014 WL 5420178, at *5 ("The ALJ need not be concerned with a physician's conclusions as to disability for worker's compensation but cannot disregard a physician's findings . . .") (internal citation omitted); *Booth*, 181 F. Supp. 2d at 1105.

The ALJ is correct that the terminology is different, and therefore an ALJ must consider the distinctions between workers' compensation and social security disability terminology.  *See Desrosiers*, 846 F.2d at 576; *Booth*, 181 F. Supp. 2d at 1109 (ALJ erred when he failed to adequately translate physician's workers' compensation terms into Social Security terms); *Payan v. Chater*, 959 F. Supp.

1197, 1204 (C.D. Cal. 1996). "While the ALJ's decision need not contain an explicit 'translation,' it should at least indicate that the ALJ recognized the difference between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology, on the other hand," and take those differences into account. *Booth*, 181 F. Supp. 2d at 1106. An ALJ is also "entitled to draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Plaintiff contends the ALJ failed to translate and consider the language in the opinions of Drs. Farsar and Rashti precluding him from prolonged sitting, standing, and walking into functional limitations in plaintiff's RFC. *See* P. Mem. at 20-22. Both parties acknowledge that the prohibition against "prolonged sitting" is not defined in the workers' compensation context.[4] *See* P. Mem. at 21; D. Mem. at 4. But plaintiff relies on a Ninth Circuit case interpreting the prohibition against "prolonged sitting" as being unable to perform any type of sedentary work, which requires the ability to sit or stand for six to eight hours a day. *See* P. Mem. at 21 (citing *Vertigan v. Halter*, 260 F.3d 1044, 1048-52 (9th Cir. 2001)). The instant case is distinguishable, however, because the ALJ here relied on the VE's testimony in finding that plaintiff could perform light work as a small parts assembler and assembly press operator, and the VE testified that these combined

---

[4] In workers' compensation parlance, the preclusion from prolonged weight bearing contemplates the ability to do work approximately 75% of the time in standing or walking position. 1997 Schedule for Rating Permanent Disabilities at 2-19. But prolonged sitting is not defined. The courts in this circuit have applied different definitions to prolonged sitting. *See Argueta v. Colvin*, 2016 WL 4138577, at *10-*11 (E.D. Cal. Aug. 3, 2016) (the ability to sit for one hour at a time up to six hours was a reasonable interpretation of "no prolonged sitting"); *Booth*, 181 F. Supp. 2d at 1108 ("It is logical to assume that [the workers' compensation physician's] reference to 'prolonged' sitting means sitting at least half of the work day.").

1   jobs require four and a half hours of sitting and four and a half hours of standing.

2   *See* AR at 41-42, 96.  As such, the ALJ's determination that plaintiff was capable

3   of performing his past relevant work as a small parts assembler and assembly press

4   operator appears to be consistent with the opinions of Drs. Farsar and Rashti

5   precluding plaintiff from "prolonged" sitting, standing, or walking.  Thus,

6   assuming the ALJ was required to consider the treating physicians' preclusion of

7   plaintiff from "prolonged" sitting, standing, and walking, the ALJ's failure to do so

8   appears to be harmless error.  *See Molina*, 674 F.3d at 1115 ("[A]n error is

9   harmless so long as there remains substantial evidence supporting the ALJ's

10  decision and the error does not negate the validity of the ultimate conclusion.").

11          But the same is not true of the ALJ's failure to translate and consider Dr.

12  Rashti's opinion precluding plaintiff from "repetitive" bending, stooping, kneeling,

13  and squatting.  *See* AR at 377.  Specifically, plaintiff argues that Dr. Rashti's

14  opinion precluding him from repetitive bending, stooping, kneeling, and squatting

15  is inconsistent with the ALJ's determination that plaintiff has the RFC to

16  "frequently balance, stoop, crouch, and crawl."  *See id.* at 31-32; Reply at 7.  As

17  plaintiff points out, "a preclusion from repetitive activity for California's workers'

18  compensation purposes contemplates a 50% reduction in capacity."  *Baltazar v.*

19  *Astrue*, 2012 WL 2319263, *5 (C.D. Cal. June 19, 2012).  By contrast,"frequent"

20  for Social Security purposes means having the capacity to perform an activity up to

21  two-thirds of the time.  *See* Social Security Ruling (SSR) 83-10; *Alvarez v.*

22  *Comm'r of Soc. Sec.*, 2018 WL 4616344, at *5 (C.D. Cal. Sep. 24, 2018) (adopting

23  plaintiff's argument that "a restriction from 'repetitive' motion indicates a 50%

24  loss of pre-injury capacity," and remanding because the ALJ's determination that

25  plaintiff could perform tasks frequently was not necessarily consistent with the

26  treating physicians' finding that plaintiff was restricted from performing those acts

27  repetitively).  Thus, the ALJ should have translated Dr. Rashti's opinion because

28

his determination that plaintiff has the RFC to "frequently balance, stoop, crouch, and crawl" appears inconsistent with Dr. Rashti's opinion precluding plaintiff from "repetitive" bending, stooping, kneeling, and squatting. *See* AR 31-32, 377.  As such, the ALJ's disregard of Dr. Rashti's opinion as of limited probative value because it relied on worker's compensation criteria was not a specific and legitimate reason.

The ALJ's second reason for rejecting the opinions of Drs. Farsar and Rashti was that there was insufficient objective evidence in support of their opinions and diagnoses. *Id.* at 39.  But the record indicates that the opinions and diagnoses of Drs. Farsar and Rashti were based on various forms of objective evidence including clinical findings, MRI reports, and electrodiagnostic testing. *See id.* at 356-57, 361-62, 383-86, 1165-66.  Indeed, the ALJ recounted much of this evidence himself (*see id.* at 24-27), making his finding that their diagnoses did not rely on imaging or other objective evidence somewhat perplexing.

On February 14, 2014, Dr. Farsar issued a Permanent and Stationary Report indicating plaintiff's work restrictions were based on subjective and objective factors, including his clinical findings as well as the MRI results described above regarding plaintiff's cervical spine, lumbar spine, and right knee. *See id.* at 356-57, 361-62, 1158-75.  Similarly, Dr. Rashti issued a Final Orthopaedic Evaluation Report explicitly stating plaintiff's work restrictions were based on various objective factors including MRI findings, positive clinical findings, and electrodiagnostic testing. *See id.* at 371-80.  In addition to reviewing plaintiff's MRI results, Dr. Rashti also performed electrodiagnostic testing of plaintiff's cervical and lumbar spine, which contributed to the basis of his opinion. *See id.* at 376-77, 383-86.  The cervical electrodiagnostic testing revealed very severe impairments on the right suprascrapular nerve, left radial nerve medial branch, right unlar nerve, and left thoracic nerve; severe impairments on the left occipital

nerve and right thoracic nerve; marked impairment of the left cervical nerve; moderate impairments on the left thoracic nerve; and mild impairments on the posterior division of the right cervical nerve and right first thoracic nerve. *Id.* at 383. The lumbar spine electrodiagnostic testing revealed very severe impairment of the bilateral upper lumbar nerve, left femoral cutaneous nerve, bilateral femoral cutaneous nerve, right saphenous nerve, bilateral peroneal nerve; severe impairment of the bilateral sural nerve and right femoral cutaneous nerve; marked impairment of the right femoral cutaneous nerve; and moderate impairment of the left saphenous nerve. *Id.* 386. Additionally, in determining plaintiff's work restrictions, Dr. Rashti relied on his clinical findings which revealed loss of range of motion in plaintiff's cervical and lumbosacral regions, a limp favoring on the right side, weakness of the right quadriceps, and tenderness at the cervical and lumbosacral regions, and right knee. *Id.* at 373-77.

Notably, the ALJ did not find the treating physicians' opinions were not supported by the objective evidence they cited; he found they failed to cite sufficient objective evidence at all. But that was not the case. Dr. Rashti's evaluation report reflects that he relied on clinical findings, MRIs, and electrodiagnostic testing in forming his opinion. For the same reason, the ALJ's assertion that the diagnoses of plaintiff's treating physicians appear to rely on self-reported symptoms rather than on objective evidence (*see* AR at 39) is contrary to the record. *See Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) ("[A]n ALJ must evaluate the physician's assessment using the grounds on which it is based."). Thus, the ALJ's conclusory statement that the diagnoses of plaintiff's treating physicians failed to cite sufficient objective evidence in support and instead appear to rely on self-reported symptoms rather than objective evidence is not a specific and legitimate reason supported by substantial evidence for rejecting their opinions.

1    The ALJ's third reason for rejecting the opinions of plaintiff's treating

2  physicians was that they did not include a functional assessment regarding

3  plaintiff's residual capacity.  AR at 39.  It is true, as discussed, that plaintiff's

4  treating physicians did not assess his functional capacity in social security terms.

5  But they did, as also discussed, opine regarding his ability to do such things as

6  walk, sit, stoop, kneel, and lift.  *See id.* at 377, 1168.  Thus, while the opinions of

7  Drs. Farsar and Rashti regarding plaintiff's work restrictions may be different than

8  the typical functional assessment provided in a Social Security disability case, that

9  is not a specific and legitimate reason to reject their opinions.  *See Booth*, 181 F.

10  Supp. 2d at 1105.

11    Accordingly, the ALJ failed to cite specific and legitimate reasons supported

12  by substantial evidence for rejecting the opinions of plaintiffs' treating physicians.

13  **B.**  **The ALJ Provided Clear and Convincing Reasons for Discounting**

14  **Plaintiff's Testimony**

15    Plaintiff argues the ALJ erred by rejecting plaintiff's subjective testimony on

16  the ground that there were several inconsistencies in the record.  *See* P. Mem. at

17  22-25.  Plaintiff contends the ALJ did not accurately represent his testimony in his

18  decision.  *Id.*

19    The ALJ must clearly articulate specific reasons for the weight given to a

20  claimant's alleged symptoms, supported by the record.  SSR 16-3p.  To determine

21  whether testimony concerning symptoms is credible, the ALJ engages in a two-step

22  analysis.  *Trevizo v. Berryhill*, 862 F.3d 987, 1000 (9th Cir. 2017) (citing *Garrison*

23  *v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014)).  First, the ALJ must determine

24  whether a claimant produced objective medical evidence of an underlying

25  impairment that could reasonably be expected to produce the symptoms alleged.

26  *Id.*  Second, "[i]f such evidence exists and there is no evidence of malingering, the

27  ALJ can reject the claimant's testimony about the severity of [his] symptoms only

28

1   by offering specific, clear and convincing reasons for doing so," and those reasons

2   must be supported by substantial evidence in the record. *Id.*; *Carmickle v. Comm'r*

3   *of Soc. Sec.*, 533 F.3d 1155, 1161 (9th Cir. 2008).

4        An ALJ may consider several factors in weighing a claimant's testimony at

5   the second step, including: ordinary techniques of credibility evaluation such as a

6   claimant's reputation for lying; the failure to seek treatment or follow a prescribed

7   course of treatment; and inconsistencies with the claimant's testimony or between

8   the testimony and claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035,

9   1039 (9th Cir. 2008); *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991);

10  *Ynzunza v. Astrue*, 2010 WL 3270975, at *3 (C.D. Cal. Aug. 17, 2010).  But

11  "subjective pain testimony cannot be rejected on the sole ground that it is not fully

12  corroborated by objective medical evidence." *Rollins v. Massanari*, 261 F.3d 853,

13  857 (9th Cir. 2001) (citation omitted).  The ALJ must also "specifically identify the

14  testimony [from the claimant] that she or he finds not to be credible . . . explain

15  what evidence undermines the testimony." *Treichler v. Comm'r of Soc. Sec.*, 775

16  F.3d 1090, 1102 (9th Cir. 2014) (quoting *Holohan*, 246 F.3d at 1208).

17       At the first step, the ALJ here found plaintiff's medically determinable

18  impairments could reasonably be expected to cause the symptoms alleged.  AR at

19  35.  At the second step, because the ALJ did not find any evidence of malingering,

20  the ALJ was required to provide clear and convincing reasons for discounting

21  plaintiff's testimony.  The ALJ discounted plaintiff's testimony because plaintiff's

22  statements concerning the intensity, persistence, and limiting effects of his

23  symptoms were not entirely consistent with the medical evidence and other

24  evidence of the record.  *Id.*  Specifically, the ALJ discounted plaintiff's subjective

25  testimony based on several inconsistencies in his testimony, daily activities, and

26  the objective medical evidence.  *Id.* at 35-38.

27       Inconsistency between a claimant's alleged symptoms and his daily

28

21

1    activities may be a clear and convincing reason to find a claimant less credible.

2    *Tommasetti*, 533 F.3d at 1039; *Bunnell*, 947 F.2d at 346.  But "the mere fact a

3    plaintiff has carried on certain daily activities, such as grocery shopping, driving a

4    car, or limited walking for exercise, does not in any way detract from her

5    credibility as to her overall disability."  *Vertigan v. Halter*, 260 F.3d 1044, 1050

6    (9th Cir. 2001).  A claimant does not need to be "utterly incapacitated."  *Fair v.*

7    *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

8           Here, the ALJ found that despite plaintiff's allegation that he was "always in

9    pain," plaintiff admitted that he was able to drive short distances, sweep, mop,

10   shop for groceries with his family, prepare simple meals every day, water the

11   garden, do laundry, and manage self-care without assistance.  *See* AR at 36, 290-

12   95.  Additionally, although plaintiff indicated that he has a difficult time getting

13   along with others (*see id.* at 294), in the same report plaintiff stated that he gets

14   along "very well" with authority figures, attends church every week, takes public

15   transportation, and attends family functions.  *Id.* at 36, 290-95.  The court also

16   notes plaintiff similarly reported that he does not have any problems getting along

17   with family friends, neighbors, or others.  *Id.* at 294.  While performing normal

18   daily activities is not necessarily inconsistent with plaintiff's claim of disability,

19   the inconsistency between plaintiff's testimony regarding his difficulty getting

20   along with others and his daily activities involving social interaction is a clear and

21   convincing reason to discount his testimony.  *See id.* at 294, 303, 923; *Molina,* 647

22   F.3d at 1112 (finding plaintiff's ability to walk grandchildren to and from school,

23   attend church, go shopping, and take walks undermined her claims that she was

24   incapable of being around others without suffering debilitating panic attacks).

25          The ALJ also noted that plaintiff made several inconsistent statements

26   regarding his inability to drive due to his alleged impairments.  *Id.* at 36.  In his

27   Function Report to the State Agency dated January 30, 2014, plaintiff alleged he

28

1   was limited in his ability to drive due to his poor eyesight. *Id*. at 292.  During the

2   hearing, plaintiff testified that he did not drive because he gets sleepy sometimes

3   and would end up falling asleep, and that he stopped driving when he "lost his

4   eyesight" due to diabetes. *Id.* at 66-67.  Plaintiff also testified that he was able to

5   drive up until 2014, but that he stopped because his knee bothered him. *Id.* at 67.

6   Despite plaintiff's alleged impairments, he indicated that he still continued to drive

7   throughout 2014. *See id.* at 301, 643.  Additionally, plaintiff later testified that he

8   repeatedly tried to take the driving test to obtain his license up until a month prior

9   to the February 22, 2017 hearing, but was unable to pass the written exam. *Id.* at

10  87-88.  These inconsistencies in plaintiff's allegations regarding his inability to

11  drive due to his alleged impairments are also a clear and convincing reason for

12  discounting plaintiff's testimony. *See Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th

13  Cir. 2014) (citing *Smolen*, 80 F.3d at 1284) ("An ALJ may consider a range of

14  factors in assessing credibility, including . . . prior inconsistent statements

15  concerning the symptoms, and other testimony by the claimant that appears less

16  than candid.").

17          In addition, the ALJ indicates that there is an inconsistency as to whether

18  Margarita Barajas is plaintiff's wife, friend, or neighbor.  AR 37.  The ALJ notes

19  that while Mrs. Barajas was referred to as plaintiff's wife during the hearing and in

20  plaintiff's Function Report dated February 2, 2014 (*see id.* at 65, 298), she was

21  referred to as plaintiff's friend or neighbor in plaintiff's Disability Report dated

22  May 5, 2015. *Id.* at 37, 317.  Plaintiff somewhat oddly does not offer any

23  explanation to clarify this inconsistency.  Nonetheless, this appears a likely error in

24  completing a category in the Disability Report, and seems to have little bearing on

25  the credibility of plaintiff's subjective complaints.  This is not is a clear and

26  convincing reason to discount his testimony.

27          The ALJ additionally found plaintiff made inconsistent statements regarding

28

the date on which he stopped working. *Id.* at 37. Plaintiff alleged that he has been unable to work since November 2012, the alleged onset date. *See id.* at 61-62, 101, 269. But in November 2012, during an examination by his treating physician Dr. Farsar, plaintiff reported he was still working 9 hours per day, 11 days out of 15 days with work restrictions precluding lifting. *Id.* at 351. By contrast, in February 2015, plaintiff reported to Dr. Rostamloo that he had stopped working in 2011. *Id.* at 590. Further, although plaintiff testified he was unable to work since 2012, plaintiff later testified he was still looking for work, even up until a few months before the February 22, 2017 hearing. *See id.* at 61-62, 78-80. The inconsistencies regarding when plaintiff stopped working and why he continued to look for work after representing that he was unable to work are a clear and convincing reason for discounting plaintiff's testimony.

Moreover, the ALJ found inconsistencies regarding plaintiff's use of medication. *Id.* at 35-36. The ALJ noted plaintiff did not list any prescribed pain medication in his Disability Report from January 2014, although he listed other medications. *See id.* at 35-36, 271. The record indicates that plaintiff was prescribed with Tramadol for his moderate to severe pain. *See id.* at 296, 311, 394, 460, 476, 486, 492, 497. In 2014, plaintiff indicated he was taking Tramadol only every other day due to gastrointestinal distress. *Id.* at 645. But in 2015, plaintiff indicated he stopped taking Tramadol for a month, and only used over-the-counter medication for his pain. *Id.* at 589. Although plaintiff previously indicated that Tramadol caused him gastrointestinal distress, he did not provide that as the reason for suspending his use of Tramadol. *See id.* at 589. As such, although not particularly compelling by itself, the inconsistency regarding plaintiff's allegations of pain and his suspended use of Tramadol without an explanation is a further clear and convincing reason to discount his testimony. *See Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (the ALJ noted in assessing plaintiff's subjective

1  allegations that plaintiff's physical ailments were treated with an over-the-counter
2  medication).

3         The ALJ found there were also inconsistencies in plaintiff's testimony
4  regarding his use of medication for mental health.  AR at 37.  Although plaintiff
5  initially indicated that he did not take any "drugs" for mental health, plaintiff
6  appeared to be confused about the term "drugs" since he stated, "I don't know
7  drugs." *Id.* at 71.  Once the ALJ clarified that he was asking if plaintiff took
8  "prescribed medications for mental health," plaintiff clearly stated that he did.  *Id.*
9  Plaintiff indicated that he took Amitriptyline and Buspirone for depression and
10  anxiety, and his use of medication for his mental health is substantiated by the
11  record.  *Id.* at 74-75, 311, 401, 404.  As such, plaintiff's initial inconsistency
12  regarding his use of medication for mental health is not a clear and convincing
13  reason to discount his testimony regarding his use of medication for mental health.

14        Lastly, the ALJ also noted that plaintiff made inconsistent statements
15  regarding whether his workers' compensation case had been resolved.  *Id.* at 38.
16  Although during the hearing plaintiff indicated that his worker's compensation
17  case had not been resolved (*see id.* at 64-65), the record indicates some payment of
18  benefits.  *Id.* at 352-53, 423, 625.  Thus, the apparent inconsistency between
19  plaintiff's testimony and the record regarding whether plaintiff's workers'
20  compensation case had been resolved is a further clear and convincing reason to
21  discount his testimony.

22        Accordingly, although not all the inconsistencies found by the ALJ were
23  clear and convincing, the other inconsistencies cited between plaintiff's testimony,
24  daily activities, and the evidence of record, taken together, amount to clear and
25  convincing reasons for the ALJ to reject plaintiff's subjective testimony.

26  **C.**     **The ALJ Properly Considered the Lay Testimony**

27        Plaintiff argues the ALJ failed to properly evaluate the statements of

28

plaintiff's lay witness, Margarita Barajas.  *See* P. Mem. at 26-27.

"[L]ay testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence and therefore *cannot* be disregarded without comment."  *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) (internal quotation marks, ellipses, and citation omitted); *see Smolen*, 80 F.3d at 1288; *see also* 20 C.F.R.§§ 404.1513(d)(4), 416.913(d)(4) (explaining that the Commissioner will consider all evidence from "non-medical sources," including "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy").  The ALJ may only discount the testimony of a lay witness if he provides specific "reasons that are germane to each witness."  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *see Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and give reasons germane to each witness for doing so.").

Margarita Barajas, who is generally listed as plaintiff's wife, completed a Third Party Function Report on February 2, 2014.  AR at 298-305.  The ALJ discounted Mrs. Barajas's Third-Party Report based on inconsistencies with plaintiff's Third Party Report and her unclear status as plaintiff's wife, friend, or neighbor.  *See id.* at 36-37.

In the Function Report, Mrs. Barajas stated plaintiff was anxious and depressed, and she repeatedly stated he was sleeping a lot more, while also noting he woke up a lot from pain.  *Id.* at 298-99.  Plaintiff reported that he did not sleep well because of chronic pain.  *Id*. at 291.  Mrs. Barajas stated plaintiff was unable to leave the house by himself because he would forget where he was (*see id.* at 299), but plaintiff indicated he could drive, take public transportation, take short walks, and leave the house by himself without difficulty.  *Id.* at 290-95.  In response to a question regarding whether plaintiff did any house work, Mrs.

1    Barajas stated only that plaintiff made lunch and walked the dog for a bit.  *Id.* at

2    300.  By contrast, plaintiff indicated he swept, mopped, did laundry, watered the

3    plants, and helped with grocery shopping.  *Id.* at 291.  Plaintiff also indicated that

4    he could handle money and pay bills (*see id.* at 292-93), but Mrs. Barajas reported

5    that she had to remind him to take his medication, pay bills, and "mostly

6    everything." *Id.* at 300.  Additionally, plaintiff reported he would prepare simple

7    meals everyday, which took ten to thirty minutes (*id.* at 291), but Mrs. Barajas

8    reported he prepared meals only once a week and it took him two hours.  *Id.* at 300.

9    Although not all of these are serious inconsistencies, the ALJ did point out genuine

10   unexplained inconsistencies germane to his assessment of Mrs. Barajas's

11   testimony.

12          Additionally, as discussed above, the ALJ noted that it is unclear whether

13   Mrs. Barajas is plaintiff's wife, friend, or neighbor.  *Id.* at 37, 298, 317.  While this

14   discrepancy is not a convincing reason to discount plaintiff's testimony, and even

15   as to Mrs. Barajas is likely a simple error, Mrs. Barajas's unclear status does call

16   into question the extent to which she was able to observe plaintiff.

17          Thus, the ALJ cited germane reasons supported by substantial evidence for

18   discounting Mrs. Barajas's statements given the multiple inconsistencies between

19   her report and plaintiff's report.

20   **D.    The ALJ Must Reassess Plaintiff's RFC and Pose a Complete**

21          **Hypothetical to the Vocational Expert**

22          Plaintiff contends the ALJ erred in his RFC determination because it did not

23   take into account plaintiff's subjective complaints, and failed to incorporate the

24   standing and walking limitations opined by plaintiff's treating physicians.  P.

25   Mem. at 25-26.  Plaintiff additionally contends the hypothetical the ALJ posed to

26   the vocational expert was incomplete because it did not incorporate the standing

27   and walking and postural limitations opined by the treating physicians.  *Id.* at 27.

28

1    For the reasons discussed above, the ALJ gave clear and convincing reasons

2    for discounting plaintiff's testimony.  As such, although the ALJ did plaintiff the

3    benefit of the doubt to the extent he accounted for some of plaintiff's subjective

4    complaints in his RFC assessment (*see* AR at 38), the ALJ did not err in failing to

5    account for all of plaintiff's subjective complaints in his RFC assessment.

6    As also discussed above, although the ALJ erred in rejecting the treating

7    physicians' opinions, that error was harmless with respect to the standing and

8    walking limitations.  But that was not the case with respect to the postural

9    limitations they opined.  Consequently, on remand, the ALJ must reassess

10   plaintiff's RFC after reconsidering all the medical opinions, and must pose a

11   complete hypothetical to the VE consistent with that RFC reassessment.

12                                    **V.**

13                        **REMAND IS APPROPRIATE**

14   The decision whether to remand for further proceedings or reverse and

15   award benefits is within the discretion of the district court.  *McAllister v. Sullivan*,

16   888 F.2d 599, 603 (9th Cir. 1989).  It is appropriate for the court to exercise this

17   discretion to direct an immediate award of benefits where: "(1) the record has been

18   fully developed and further administrative proceedings would serve no useful

19   purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting

20   evidence, whether claimant testimony or medical opinions; and (3) if the

21   improperly discredited evidence were credited as true, the ALJ would be required

22   to find the claimant disabled on remand."  *Garrison*, 759 F.3d at 1020 (setting

23   forth three-part credit-as-true standard for remanding with instructions to calculate

24   and award benefits).  But where there are outstanding issues that must be resolved

25   before a determination can be made, or it is not clear from the record that the ALJ

26   would be required to find a plaintiff disabled if all the evidence were properly

27   evaluated, remand for further proceedings is appropriate.  *See Benecke v. Barnhart*,

28

379 F.3d 587, 595-96 (9th Cir. 2004); *Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th Cir. 2000).  In addition, the court must "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled. *Garrison*, 759 F.3d at 1021.

Here, as set forth above, remand is appropriate because there are outstanding issues that must be resolved before it can be determined whether plaintiff is disabled.  The ALJ must reconsider and appropriately assess the opinions of the treating physicians, and either credit their opinions or provide specific and legitimate reasons supported by substantial evidence for rejecting them.  The ALJ must then reassess plaintiff's RFC and proceed through steps four and five to determine what work, if any, plaintiff is capable of performing.

## VI.

## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits, and REMANDING the matter to the Commissioner for further administrative action consistent with this decision.

DATED: May 18, 2020

_____
SHERI PYM
United States Magistrate Judge

29